UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
DANIEL BRECHER, SCOTT SHORT,                    :
CHAD TAYLOR, JENNIFER MURPHY,                   :
PAUL KOCH and MARK OELFKE,                      :
individually and on behalf of all others        :
similarly situated,                             :
                                                :
                              Plaintiffs,        :
                                                :        09 Civ. 7359 (SHS)
              -against-                          :
                                                :        <u>OPINION & ORDER</u>
CITIGROUP INC.; CITIGROUP GLOBAL                :
MARKETS, INC.; ALAIN J.P. BELDA; C.             :
MICHAEL ARMSTRONG; KENNETH T.                   :
DERR, JOHN M. DEUTCH; RICHARD D.                :
PARSONS; ANN DIBBLE JORDAN;                     :
CITIGROUP, INC. PERSONNEL AND                   :
COMPENSATION COMMITTEE; and JOHN                :
DOES 1-30;                                      :
                                                :
                              Defendants.        :
                                                :
-----------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

        This action arises from Citigroup's alleged failure to disclose adequate truthful

information about its exposures to subprime mortgages.  Plaintiffs seek to represent a class of

those who acquired Citigroup securities via the company's employee stock purchase program.

They assert federal causes of action pursuant to Section 12(a)(2) of the Securities Act of 1933

and to Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated

thereunder.  They also bring several state statutory and common law claims.

        Defendants have moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss

plaintiffs' complaint in its entirety on the ground that it fails to set forth a claim for relief.

Because plaintiffs' Section 12(a)(2) claims are untimely, because plaintiffs have not pled scienter

for their Section 10(b) claims with the requisite particularity, and because plaintiffs have not adequately pled their state law claims, defendants' motion is granted.

## I.    BACKGROUND

The following facts are taken from plaintiffs' First Amended Consolidated Class Action Complaint ("Complaint"), unless otherwise noted.  They are assumed to be true for purposes of this motion.

### A.  The Parties

Plaintiffs Daniel Brecher, Scott Short, Chad Taylor, Jennifer Murphy, Paul Koch, and Mark Oelfke are current and former Citigroup employees residing in either California or Minnesota.  (First Am. Consolidated Class Action Compl. ("Compl.") ¶¶ 18-23.)  All purchased Citigroup securities via the company's Voluntary Financial Advisor Capital Accumulation Program ("FA CAP"), a Citigroup employee stock purchase program.  (*Id.* ¶ 1.)  They bring this action on behalf of a putative class of all Citigroup employees who acquired securities pursuant to FA CAP from November 2006 to October 8, 2009, when the Complaint was filed.  (*Id.* ¶ 39A.)

Citigroup Inc., a global diversified financial services firm, and its subsidiary, Citigroup Global Markets, Inc., are defendants in this action.  (*Id.* ¶¶ 24, 25.)  So too are six members of Citigroup's board of directors—C. Michael Armstrong, Alain J.P. Belda, Kenneth T. Derr, John M. Deutch, Richard D. Parsons, and Ann Dibble Jordan.  (*Id.* ¶¶ 26-31.)  All were allegedly on the board's Personnel and Compensation ("P&C") Committee, which administers FA CAP.  (*Id.* ¶¶ 26-31, 33.)  The P&C Committee itself is also named as a defendant.[1]  (*Id.* ¶ 33.)  Finally, thirty John Does who allegedly sold FA CAP securities are named as defendants.  (*Id.* ¶ 32.)

---

[1]    There is authority that committees of boards of directors are not suable entities.  *See In re RCN Litig.*, No. 04-5068, 2006 WL 753149, at *5 (D.N.J. Mar. 21, 2006).  However, in light of the disposition of this motion, that issue need not be decided here.

B. FA CAP

FA CAP allows certain Citigroup and Citigroup Global Markets employees to allocate up to 25% of their pretax wages to the acquisition, at a discount, of restricted Citigroup common stock or stock options. (*Id.* ¶¶ 1, 14, 15.) These securities vest over a two-year period. (*Id.* ¶ 14.) If an FA CAP participant leaves Citigroup prior to vesting, he or she forfeits the securities as well as the wages that went toward their purchase. (*Id.*)

FA CAP participants received an annual prospectus from Citigroup. (*Id.* ¶ 16.) The prospectus incorporated by reference Citigroup's Securities and Exchange Commission ("SEC") filings. (*Id.*) The prospectus and materials incorporated therein compose the "offering documents" for the FA CAP securities.

C. Citigroup's Alleged Misstatements and Omissions

Plaintiffs' federal securities claims concern Citigroup's exposures to subprime mortgages. (*Id.* ¶ 8.) Subprime mortgages are characterized by borrowers with weak credit histories, low credit scores, high debt-to-income ratios, or high loan-to-value-of-home ratios. (*Id.* ¶ 51.) Plaintiffs allege that from 2001 to 2006, rising housing prices fueled a significant increase in the number of subprime mortgages. (*Id.* ¶¶ 6, 7.) By the time the housing "bubble" burst in 2007, "a staggering 43% of Citigroup's equity was tied up in subprime related assets." (*Id.* ¶ 8.)

Plaintiffs claim that throughout 2007, until some unspecified point in mid-2008, (*id.* ¶ 131), the offering documents for FA CAP "prevented investors from learning Citigroup's actual exposure to subprime losses," (*id.* ¶ 63; *see id.* ¶ 74). This alleged fraud's modus operandi was a series of materially misleading statements and omissions concerning Citigroup's subprime

exposure, its overall business outlook, and its financial results.  (*Id.* ¶¶ 59, 63, 65, 69, 70, 78, 87, 93, 96.)

       1.   *Alleged misstatements and omissions concerning Citigroup's subprime exposure*

       a.   CDO-related omissions

The Complaint alleges that defendants failed to disclose material information about Citigroup's collateralized debt obligations ("CDOs").  A CDO contains an inventory of securities—the collateral—and sells the right to the cash flows those securities generate.  (*Id.* ¶ 52.)  A CDO packages the rights to the cash flow into different tranches that vary in their risk and return.  (*Id.*)  Citigroup, allegedly "one of the biggest players" in the CDO market, profited from the fees it charged to manage the CDOs it created.  (*Id.*)  Its CDOs often contained securities that were backed by subprime mortgages.  (*Id.*)

According to the Complaint, Citigroup's CDO operations exposed it to subprime risk that the company did not timely disclose.  Prior to November 2007, Citigroup failed to disclose that it held $11.7 billion in subprime-related securities for use as collateral in new CDOs, (*id.* ¶ 55, 84), and $43 billion of CDOs in which the primary collateral was subprime-backed securities, (*id.* ¶¶ 55, 84).  Of these CDO holdings, $25 billion were liquidity-put CDOs, which allowed purchasers of CDO securities to sell them back to Citigroup at their original value, an option the purchasers took advantage of in the summer of 2007.  (*Id.* ¶¶ 53, 54, 87.)

       b.   SIV-related misstatements and omissions

Structured investment vehicles ("SIVs") are the other alleged source of Citigroup's subprime exposure at issue.  (*Id.* ¶¶ 56, 71-73.)  An SIV invests in long-term assets.  (*Id.* ¶ 57.)  It finances its asset purchases by issuing short-term debt that typically comes due in 90 days or

less.  (*Id.*)  SIVs thereby engage in a form of arbitrage, "sell[ing] short-term debt to buy longer-term, higher-yielding assets."  (*Id.*)

An SIV must continually raise money to satisfy its recurring obligations on the short-term debt it issues.  (*Id.* ¶ 72.)  It usually accomplishes this by issuing new short-term debt.  (*Id.*)  The market for an SIV's short-term debt may dry up, however, if investors perceive weakness in the SIV's long-term assets.  (*Id.* ¶¶ 71-72.)  In the event the SIV cannot cover its short-term debt obligations by issuing new debt, it must instead sell off long-term assets.  (*Id.* ¶ 71.)  The weakness in those long-term assets results in their sale at a loss.  (*Id.* ¶ 72.)  Large enough losses can result in the SIV's total collapse.  (*Id.* ¶ 71.)

Prior to the end of 2007, "Citigroup acted as an advisor to seven SIVs that held approximately $80 billion in assets."  (*Id.* ¶ 70.)  Starting in early 2006, Citigroup "placed [] under-performing and/or non-performing" subprime-related assets into its SIVs.  (*Id.* ¶ 56.)  Citigroup did so "without full disclosure in the Offering Documents of the risks associated with this practice, including the real possibility that Citigroup was ultimately responsible to stabilize the SIVs either through cash infusions or by recapturing the SIVs' assets" in the event the SIVs could not cover their short-term debts.  (*Id.*)  In other words, Citigroup allegedly failed to inform investors that Citigroup ultimately could be held responsible for the SIVs if they collapsed.

The Complaint alleges that certain statements actually concealed this possibility.  For instance, Citigroup stated that it only managed its SIVs at "arm's length."  (*Id.* ¶ 96.)  Also, in a Form 8-K[2] filed on October 1, 2007 in which Citigroup announced disappointing third quarter results stemming from "dislocations in the mortgage-backed securities and credit markets, " (*id.* ¶ 76), Citigroup CEO Charles Prince attributed the poor results to "weak performance in fixed

---

[2]      The Complaint only sporadically indicates the particular SEC filings in which Citigroup's statements appeared.  The Court, relying on the parties' submissions, has wherever possible determined the particular SEC filing in which the statement was made.

income credit market activities, write-downs in leveraged loan commitments, and increases in consumer credit costs" and stated that Citigroup expected a "return to a normal earnings environment in the fourth quarter," (*id.* ¶ 77; Citigroup Oct. 1, 2007 Form 8-K, Ex. 8 to Decl. of Richard Rosen ("Rosen Decl.") dated Nov. 23, 2009).  The Complaint alleges that this was misleading because "[w]hile Prince was informing the public that he expected Citigroup to return to a normal earnings environment in short order, on October 13, 2007, the media reported that a number of banks, including Citigroup, had discussions with the United States Treasury Department regarding the creation of a superfund to create liquidity for SIVs and conduits that were facing liquidity problems."  (Compl. ¶ 78.)

c.   Further misstatements concerning Citigroup's subprime exposure

Plaintiffs further complain of more general statements that allegedly misled investors by failing to provide "timely and accurate information regarding Citigroup's exposure to catastrophic credit risk."  (Pls.' Mem. in Opp. to Mot. to Dismiss ("Pls.' Mem.") at 13.)  Two appeared in the FA CAP offering documents.  The first was a February 23, 2007 Form 10-K that stated that from 2004 to 2005 Citigroup's "[subprime] mortgage originations declined 20%, reflecting the Company's decision to avoid offering teaser rate and interest-only mortgages to lower FICO score customers" and that Citigroup's "mortgage loan securitizations are primarily non-recourse, thereby effectively transferring the risk of future credit losses to the purchasers of the securities issued by the trust."  (*Id.* ¶¶ 64, 65; Citigroup Feb. 23, 2007 Form 10-K, Ex. 4 to Rosen Decl.)  The other was a July 20, 2007 Form 8-K in which Citigroup's Securities and Banking segment reported decreasing costs in the second quarter of 2007 "reflecting a stable global corporate credit environment."  (Compl. ¶ 75.)

Other statements of this variety were not contained in the offering documents but were made during conference calls or interviews with the press.   First, in a January 19, 2007 conference call, an unnamed Citigroup representative explained that the company believed that it had "adequate [loan loss] reserves."  (*Id.* ¶ 61.)  Second, in an April 16, 2007 investor conference call, Citigroup's Chief Financial Officer indicated that certain subprime mortgages in Citigroup's portfolio had "very good delinquency performance associated with them."  (*Id.* ¶ 68.)  Third, Citigroup CEO Charles Prince told the *Financial Times* in July 2007 that "[w]hen the music stops, in terms of liquidity, things will be complicated.  But as long as the music is playing, you've got to get up and dance.  We're still dancing."  (*Id.* ¶ 74.)

### 2.   *Alleged misstatements concerning Citigroup's overall business outlook*

The offering documents also included statements that allegedly misrepresented Citigroup's overall business outlook.  In a January 19, 2007 Form 8-K reporting Citigroup's year-end results for 2006, the company stated that it "continued to see positive trends from [its] strategic actions."  (*Id.* ¶ 60.)  In its 2006 Form 10-K, filed on February 23, 2007, Citigroup announced that it was entering 2007 with "good business momentum."  (*Id.* ¶ 62; Citigroup Feb. 23, 2007 Form 10-K, Ex. 4 to Rosen Decl.)  And on April 16, 2007, a Citigroup press release claimed that the company "generated strong momentum" in the first quarter of 2007 and articulated its intention to "invest to grow and integrate [its] businesses, take actions to improve efficiency and lower costs, and continue to build momentum across [its] franchises."[3]  (Compl. ¶¶ 66, 67.)

---

[3]   The parties' submissions do not indicate the SEC filing in which this press release was contained. Nevertheless, defendants' concede that this press release was incorporated into the offering documents.  (Defs.' Mem. in Supp. of Mot. to Dismiss at 14.)

### 3. Alleged misstatements of financial results

The Complaint reproduces numerous reports of Citigroup's financial results.  Some concern positive results, namely Citigroup's announcements of strong revenues and earnings from 2006 and the first two quarters of 2007.  (*Id.* ¶¶ 60, 66, 75.)  Other are negative, announcing losses and write-downs on subprime assets from October 2007, November 2007 and January 2008.  (*Id.* ¶¶ 76, 80, 81, 84, 97.)  If these statements are allegedly false—a point on which the Complaint is not clear—it would apparently be because they are instances in which Citigroup "failed to properly record losses for impaired assets."  (*Id.* ¶ 13B.)

### D.  The Subprime Market Collapses and the Truth is Revealed

The subprime mortgage market collapsed in 2007.  (*Id.* ¶¶ 7-8.)  The burst in the subprime bubble led "to billions of dollars in write-downs and lost revenues" for Citigroup on account of its subprime exposures.  (*Id.* ¶ 8.)

On November 4, 2007, Citigroup "announced significant declines in the fair value of the approximately $55 billion in the Company's U.S. subprime related direct exposures."  (*Id.* ¶ 84.) The company disclosed that that direct exposure consisted of $11.7 billion of warehoused subprime related securities and $43 billion of senior CDO tranches.  (*Id.*)  Citigroup estimated write-downs on these assets in the range of $8 to $11 billion.  (*Id.*)  Additionally, "Citigroup shareholders first learned of the liquidity put CDOs on November 4, 2007 when Citigroup filed its 10-Q for the third quarter."  (*Id.* ¶ 87.)

"In a November 6, 2007 SEC filing, Citigroup [further] disclosed that it provided $7.6 billion of emergency financing to the seven SIVs it operates after they were unable to repay maturing debt."  (*Id.* ¶ 90.)  In December 2007, Citigroup announced that it would take over its

troubled SIVs, bringing their $49 billion in assets onto the company's balance sheet and assuming $58 billion of their debt in order to avoid asset sales.  (*Id.* ¶¶ 95-96.)

These adversities weakened Citigroup's financial position.  The company posted quarterly losses, (*id.* ¶¶ 97, 116, 118), and sought out a string of capital infusions, first from private investors and ultimately from the United States government, (*id.* ¶¶ 92, 99, 109, 110, 118).  The company also reduced dividends.  (*Id.* ¶ 98.)  This negative news sent Citigroup's share price tumbling, from more than $45 during the Class Period, November 2006 to October 8, 2009, (*id.* ¶ 79), to less than $1 by March 2009, (*id.* ¶ 111).

E.   This Action

Plaintiffs Brecher and Short originally filed this action on March 24, 2009 in the United States District Court for the Southern District of California.  On August 7, 2009, the Judicial Panel on Multidistrict Litigation transferred the case to this Court as related to *In re Citigroup Inc. Securities Litigation*, No. 07 Civ. 9901.  On October 8, 2009, plaintiffs filed the First Amended Consolidated Class Action Complaint.

The Complaint asserts various federal and state causes of action on behalf of various classes of FA CAP participants.  On behalf of the entire putative class, plaintiffs assert that all defendants breached Section 12(a)(2) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77*l*(a)(2), by selling securities pursuant to prospectuses containing material misstatements and omissions.  (Compl. ¶ 119-22.)  Plaintiffs also charge Citigroup and the P&C defendants with violating Section 10(b) of the Securities Exchange Act 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by defrauding plaintiffs via material misrepresentations.  (Compl. ¶¶ 123-42.)

Plaintiffs also bring Minnesota state law claims on behalf of two different subclasses of

9

FA CAP participants employed in Minnesota.  These claims relate to Citigroup's alleged misrepresentations as well as the provision of FA CAP providing for the forfeiture of unvested securities upon an employee's departure from Citigroup.  Plaintiffs allege breach of fiduciary duty, deceptive trade practices, wage law violations and common law conversion.  (*Id.* ¶¶ 169-84.)  The complaint asserts analogous claims pursuant to California law on behalf of California-based Citigroup employees, but plaintiffs have consented to the voluntary dismissal of those claims without prejudice.  (Pls.' Mem. at 3 n.4.)

Last, plaintiffs seek a judgment declaring invalid or unenforceable a release executed by some FA CAP participants that purportedly extinguishes the claims asserted herein.  (*Id.* ¶¶ 143-45.)

## II.    DISCUSSION

### A.  Standard of Review

Defendants move pursuant to Rule 12(b)(6) to dismiss the Complaint in its entirety for the failure to state a claim upon which relief can be granted.  In resolving a Rule 12(b)(6) motion, a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  In addition to the complaint, a court may also consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *Id.*

A complaint will survive a Rule 12(b)(6) motion only if it sets forth "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint satisfies this plausibility standard "when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

     B.  <u>Federal Securities Claims</u>

The federal securities provisions plaintiffs claim were breached—Section 12(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and accompanying Rule 10b-5—are addressed to material misstatements and omissions, though they differ in scope, elements and pleading standards.

"[T]he elements of a *prima facie* claim under section 12(a)(2) are: (1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by means of a prospectus or oral communication'; and (3) the prospectus or oral communication 'include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.'" *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (quoting 15 U.S.C. § 77*l*(a)(2)).  So long as Section 12(a)(2) claims do not sound in fraud—and defendants do not contend that plaintiffs' claims do—"notice pleading supported by facially plausible factual allegations is all that is required" to state a claim to relief.  *Id.* at 358.  Plaintiffs' Section 12(a)(2) claims concern only those statements appearing in SEC filings incorporated into the FA CAP prospectus by reference.

Section 10(b)'s coverage is not limited to prospectuses; it is the "catchall cousin" of Section 12(a)(2).  *In re Morgan Stanley*, 592 F.3d at 359 (internal quotation marks omitted).  But as with Section 12(a)(2), a successful Section 10(b) claim requires that the defendant "made misstatements or omissions of material fact."  *In re Int'l Bus. Machs. Corporate Sec. Litig.*, 163

F.3d 102, 106 (2d Cir. 1998).  Section 10(b)'s remaining elements are that the defendant made the statement or omission (1) with scienter and (2) in connection with the purchase or sale of securities, and that the plaintiff (3) relied upon the statement or omission and (4) that that reliance was the proximate cause of the plaintiff's injury.  *Id.*  Claims of Section 10(b) violations must meet the heightened pleading requirements of Federal Rule of Procedure 9(b), which requires allegations that "state with particularity the circumstances constituting fraud," and those of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), discussed *infra* Part II.B.2.b.  *See ATSI Commc'ns*, 493 F.3d at 99.

Defendants seek dismissal of the securities claims on multiple grounds.  The Court addresses in turn their arguments concerning whether certain statements are materially misleading, whether the Section 12(a)(2) claims are untimely, and whether defendants acted with scienter for the purposes of the Section 10(b) claims.  Because resolution of these issues establishes that the securities claims must be dismissed in their entirety, the Court does not address the other arguments defendants make.

1.   *Statements concerning Citigroup's overall business outlook, financial results and other allegedly actionable misrepresentations*

Certain of plaintiffs' Section 12(a)(2) and 10(b) claims suffer from identical defects.

First, the statements concerning Citigroup's overall business outlook are immaterial as a matter of law.  A statement is material for the purposes of both Sections 12(a)(2) and 10(b) if it is capable of misleading a reasonable investor.  *See In re Morgan Stanley*, 592 F.3d at 360. Pronouncements of corporate optimism that are "too general to cause a reasonable investor to rely upon them" are not material and are properly dismissed as such at the pleadings stage. *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).  The allegedly offending declarations concerning Citigroup's overall

business outlook—that Citigroup "continued to see positive trends from [its] strategic actions," (Compl. ¶ 60); that it had "good business momentum," (*id.* ¶ 62); that it had "generated strong momentum," (*id.* ¶ 66); and that it would continue to "invest to grow and integrate [its] businesses, take actions to improve efficiency and lower costs, and continue to build momentum across [its] franchises," (*id.* ¶ 67)—are exactly the type of generalized boosterism that is not actionable.  *See JP Morgan Chase*, 553 F.3d at 206 (statements that a company "set[s] the standard for integrity," and that it would "continue to reposition and strengthen [its] franchises with a focus on financial discipline" were immaterial); *Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (statements touting a company's "commitment to create earnings opportunities" and its conviction that its "business strategies [would] lead to continued prosperity" were immaterial); *San Leandro Emergency Medical Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 811 (2d Cir. 1996) (statements that a company "'*should* deliver income growth consistent with its historically superior performance' and '[is] optimistic about 1993'" were immaterial (emphasis in original)).  Because no reasonable investor would rely on these statements as assurances that Citigroup would not suffer setbacks in the subprime market or elsewhere, the Section 12(a)(2) and 10(b) claims predicated on these statements must be dismissed as immaterial.

Second, the Complaint reproduces many Citigroup announcements of financial results, including the positive (Compl. ¶¶ 60, 66, 75), and the negative, (*id.* ¶¶ 76, 80, 81, 84, 97), but nowhere alleges factual matter indicating that these announcements were false at the time made.  At best the Complaint suggests that on the basis of subsequent write-downs on assets Citigroup's earlier financial results must have been misleading.  This type of hindsight-pleading fails to state a claim under the notice pleading standard of Section 12(a)(2), *see, e.g.*, *In re Barclays Bank*

*PLC Sec. Litig.*, No. 09 Civ. 1989, 2011 WL 31548, at *5 (S.D.N.Y. Jan. 5, 2011), and the

heightened pleading standard applicable to Section 10(b), *see, e.g.*, *Novak v. Kasaks*, 216 F.3d

300, 309 (2d Cir. 2000).  Accordingly, the Section 12(a)(2) and 10(b) claims based on

Citigroup's announcements of financial results must be dismissed.

        Finally, although the Complaint asserts that Citigroup "was not as well capitalized as

represented" in the offering documents, (Compl. ¶ 13D), it fails to identify a single statement

from the offering documents concerning Citigroup's capital adequacy.  This failure violates the

pleading requirements of Section 10(b), which necessitate that the Complaint "specify the

statements that the plaintiff contends were fraudulent."  *Novak*, 216 F.3d at 306.  And it also

violates the lower threshold of notice pleading applicable to plaintiffs' Section 12(a)(2) claims—

without knowing what the offering documents told investors regarding Citigroup's capital

adequacy, the Complaint cannot support a plausible inference that the offering documents misled

investors on that subject.  *Cf. In  re Morgan Stanley*, 592 F.3d at 365-66 (plaintiffs failed to

plead an actionable omission pursuant to Section 12(a)(2) by failing to plead the existence of

information rendering the corporation's statements misleading).  This inadequately pled claim

concerning the offering documents' representations of Citigroup's capital adequacy cannot

proceed.

        Plaintiffs identify in their opposition memorandum various statements concerning

Citigroup's capitalization, none of which appear in the Complaint.  (Pls.' Mem. at 15-17.)  In so

doing, plaintiffs effectively attempt to amend their Complaint via their opposition memoranda.

This they may not do.  *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998);

*Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759, 764 n.4 (S.D.N.Y. 2006).  The statements in

plaintiffs' opposition memorandum that are not alleged in the Complaint are not properly before the Court.

>    2.   *Alleged misstatements and omissions concerning Citigroup's subprime exposure*

The foregoing discussion does not resolve the gravamen of the Complaint—the alleged misstatements and omissions about Citigroup's subprime exposure. *See supra* Part I.C.1. Assuming arguendo that the statements and omissions concerning Citigroup's subprime exposure were misleading, the Court concludes that the Section 12(a)(2) subprime-exposure claims must be dismissed as untimely and the Section 10(b) subprime-exposure claims must be dismissed for failure to plead scienter.

>    a.   Section 12(a)(2) subprime exposure claims are barred by the statute of limitations

>         i.   Legal Standard

Section 12(a)(2) claims are subject to the Securities Act's one-year statute of limitations, which runs from the date of the plaintiff's "discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. In other words, the limitations period commences no later than the date when a reasonably diligent plaintiff would have discovered the facts constituting the violation. *Cf. Merck & Co., Inc. v. Reynolds*, 130 S. Ct. 1784, 1798 (2010); *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174 (2d Cir. 2011).[4] The date a fact is deemed "discovered" is the date upon which a reasonably diligent plaintiff could have pled that fact "with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *City of Pontiac*, 637 F.3d at

---

[4]    Though *Merck* and *City of Pontiac* concern the Exchange Act's statute of limitations, applying them in the Securities Act context is consistent with that Act's statute of limitations. *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 371 (S.D.N.Y. 2011); *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, Nos. 08 Civ. 8781, 08 Civ. 5093, 2011 WL 2020260, at *4 (S.D.N.Y. May 19, 2011).

175.  Although the date discovery should have occurred is a factual issue, if the relevant facts "can be gleaned from the complaint and papers . . . integral to the complaint, resolution of the issue on a motion to dismiss is appropriate." *LC Capital Partners, LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 156 (2d Cir. 2003).

ii.    Application

Whether plaintiffs' Section 12(a)(2) claims are timely turns on when plaintiffs, in the exercise of reasonable diligence, should have discovered enough information to plead that the statements and omissions at issue in the Complaint were misleading.  *See City of Pontiac*, 637 F.3d at 175; *see also Merck*, 130 S. Ct. at 1801 (Scalia, J., concurring) (application of the Securities Act's statute of limitations requires "[d]etermining when the plaintiff should have uncovered an untrue assertion in a registration statement or prospectus").   As defendants point out—and as the Complaint itself makes abundantly clear—Citigroup, in a series of disclosures in November and December 2007, provided investors with information sufficient to enable plaintiffs to meet their pleading burden.  Indeed, these disclosures announced the *very information* the Complaint alleges had been misrepresented or withheld.  This "explicit information" put plaintiffs on notice of the existence of the alleged misleading statements and omissions concerning Citigroup's subprime exposures.  *In re Barclays Bank*, 2011 WL 31548 at *7.  Accordingly, the one-year limitations period for plaintiffs' Section 12(a)(2) claims commenced no later than the end of 2007.  Because plaintiffs did not bring this action until March 24, 2009—more than one year later—their Section 12(a)(2) claims concerning Citigroup's subprime exposures are untimely.

With respect to CDOs, the Complaint alleges that the offering documents failed to disclose the existence of Citigroup's liquidity put CDOs, the $11.7 billion in subprime securities

16

Citigroup warehoused for incorporation in CDOs, and the $43 billion in senior tranches of subprime-backed CDOs Citigroup held.  (Compl. ¶¶ 55, 59.)  But the Complaint itself alleges that Citigroup disclosed to investors the existence of these exposures on November 4, 2007 in the following words:

> On November 4, 2007, Citigroup announced significant declines in the fair value of the approximately $55 billion in the Company's U.S. subprime related direct exposures . . . . [which] consisted of (a) approximately $11.7 billion of subprime related exposures in its lending and structuring business, and (b) approximately $43 billion of exposures in the most senior tranches (super senior tranches) or collateralized debt obligations . . . .
> [and] Citigroup shareholders first learned of the liquidity put CDOs on November 4, 2007 when Citigroup filed its 10-Q for the third quarter.

(*Id.* ¶¶ 84, 87.)  The disclosures further announced that these assets were impaired, and had been deteriorating in value since at least September 2007.  (Citigroup Nov. 5, 2007 Form 8-K, Ex. 10 to Rosen Decl.)  On the basis of these disclosures, a reasonable investor would have been on notice of the alleged CDO-related omissions charged in the Complaint by November 4, 2007, at the latest.  *See In re Barclays Bank*, 2011 WL 31548 at *6-7 (plaintiffs should have discovered their Securities Act claims on the date the company disclosed "the same information" that the plaintiffs claimed had previously been withheld); *Amorosa v. Ernst & Young LLP*, 672 F. Supp. 2d 493, 511-12 (S.D.N.Y. 2009) (Securities Act statute of limitations requires claims to be brought within one year of the disclosures that revealed the alleged violation), *aff'd sub nom. Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 416 (2d Cir. 2011) (unpublished summary order) ("The corrective disclosure date is the same as the constructive notice date for purposes of limitations." (citing *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005)).

The same holds true for plaintiffs' SIV-related claims.  The gravamen of plaintiffs' claims with respect to Citigroup's SIVs is that Citigroup, by alleged omission, (Compl. ¶¶ 56,

70, 93), and misrepresentation, (*id.* ¶¶ 76-77, 96), concealed from investors "the real possibility that Citigroup was ultimately responsible to stabilize the SIVs either through cash infusions or by recapturing the SIVs' assets should they fail," (*id.* ¶ 56).  According to the Complaint, on December 14, 2007, Citigroup "announced that it would take over the seven troubled SIVs and assume $58 billion of debt to 'avoid forced asset sales that would further erode confidence in capital markets,' according to Bloomberg. . . .  In doing so, Citigroup took responsibility for the SIVs' $49 billion worth of assets."  (*Id.* ¶ 96.)  This announcement not only revealed the allegedly concealed risk, it disclosed the very materialization of that risk.  Citigroup's announcement further explained that (1) recent market events had reduced the SIVs' ability to meet their debt repayment obligations, (2) that Citigroup would provide a "support facility" that would ensure that Citigroup-advised SIVs would be able to repay their debts, and (3) that the company would "consolidate the SIVs' assets and liabilities onto its balance sheet" and account for them at their fair market value.  (Citigroup Dec. 14, 2007 Form 8-K, Ex. 12 to Rosen Decl.)  Citigroup's disclosure also provided a breakdown of the $58 billion in debts and $49 billion in assets that would now be reflected in its balance sheet.  (*Id.*)  The December 14, 2007 disclosure was more than sufficient to put a reasonable investor on notice of a claim that Citigroup had previously omitted disclosure of the risk that it would ultimately be responsible for shoring up its SIVs.

Finally, the combined effect of the November and December 2007 announcements were certainly sufficient to put investors on notice of the alleged misstatements implicating Citigroup's general exposure to subprime and credit risk.  These statements allegedly suggested that Citigroup's mortgage practices limited its subprime risk, (Compl. ¶¶ 64, 65) and that the company was operating in a stable credit environment, (*id.* ¶ 75).  To the extent these statements

were misleading, the disclosures concerning Citigroup's CDOs and SIVs would have put a reasonable investor on notice of that fact.  The November 4, 2007 disclosure made manifest that Citigroup's subprime exposure was at least $55 billion.  And the November 4, 2007 and December 14, 2007 were clear indications that Citigroup was not operating in a stable corporate credit environment.  They set forth that Citigroup was facing "significant uncertainty" in the financial markets that could affect future results.  (Citigroup Nov. 5, 2007 Form 8-K, Ex. 10 to Rosen Decl.)  Citigroup also disclosed that the declines in the value of its CDO assets resulted in part from the fact that "certain types of credit instruments . . . became very illiquid" during the third quarter of 2007.  (Citigroup Nov. 5, 2007 Form 10-Q, Ex. 11 to Rosen Decl.)  Assuming the statements concerning general subprime and credit risk were misleading as claimed, by December 2007 plaintiffs should have been aware that they were misleading.

In sum, Citigroup's November and December 2007 disclosures provided a reasonably diligent investor with "sufficient information" to plead adequately that the statements and omissions at issue in the Complaint were misleading.  *City of Pontiac*, 637 F.3d at 175.  None of plaintiffs' arguments undermine this conclusion.  Because plaintiffs commenced this suit more than one year after a reasonably diligent plaintiff would have had sufficient information about the facts underlying the subprime-related claims asserted in the Complaint to adequately plead its Section 12(a)(2) claims, these claims are untimely.

        b.   The Section 10(b) claims must be dismissed for failure to plead scienter

              i.   Legal Standard

Liability pursuant to Section 10(b) exists only if the alleged misrepresentations were made with scienter.  Scienter is "'a mental state embracing intent to deceive, manipulate, or defraud.'"  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst*

& *Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).  To survive a motion to dismiss, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter.  15 U.S.C. § 78u-4(b)(2).  An inference of scienter qualifies as strong "only if a reasonable person would deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  This comparative inquiry requires the Court to "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference." *Id.* at 322.

A plaintiff may plead scienter by alleging facts "to show either (1) that defendants had the motive and opportunity to commit fraud; or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *JP Morgan Chase Co.*, 553 F.3d at 198.  A successful showing of motive requires allegations that corporate insiders "benefitted in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307-08.  "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute motive for purposes of this inquiry." *JP Morgan Chase Co.*, 553 F.3d at 198 (internal quotation marks omitted).  As to recklessness, sufficient pleadings typically entail allegations that the defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 311.  "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id.* at 309.

To state a claim against any individual defendant, a plaintiff must allege facts indicating that that particular defendant acted with scienter. *See, e.g.*, *In re BISYS Sec. Litig.*, 397 F. Supp.

2d 430, 440 & n.44 (S.D.N.Y. 2005).  In the case of a defendant that is a corporate entity, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter," though that "someone" need not be an expressly identified individual.  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

ii.   Application

Plaintiffs postulate two motives that spurred the alleged fraud and also argue that defendants were reckless in allegedly concealing Citigroup's subprime exposures.  The Court concludes these theories do not establish scienter adequately, necessitating dismissal of plaintiffs' Section 10(b) claims.

The first asserted motive is that Citigroup misrepresented its subprime exposures because

[b]y early 2008, Citigroup was in desperate financial shape and looking to raise much-needed capital.  At the end of 2007, Citigroup's Chief Executive Officer Charles Prince resigned and his successor was scrambling to implement a plan to save the Company and protect his job. He needed to raise capital and had the motivation to mislead to do so.

(Pls.' Mem. at 32.)  This theory of motive suffers from at least two flaws.  One is that it postdates the alleged fraud.  *Cf. Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000) (motive that predated the fraud could not support an inference of scienter).  The Complaint alleges that defendants misrepresented and concealed Citigroup's subprime exposures over the course of 2007 (until they were revealed in November and December of 2007).  But according to plaintiffs, Citigroup's need to raise capital did not arise until "the end of 2007" or "early 2008."  (Pls.' Mem. at 32.)  The resulting inference that plaintiffs would have the Court draw—that defendants committed fraud in service of a motive that did not yet exist—is not plausible.  The other deficiency is that the desire to raise capital is "amongst the broadest, most generalized, and most

21

commonplace motives of corporate motivation for any action." *In re Gilat Satellite Networks, Ltd.*, No. 02 Civ. 1510, 2005 WL 2277476, at *19 (E.D.N.Y. Sept. 19, 2005).  Multiple courts have rejected the invitation to infer scienter on the basis of a generic desire to raise capital, even much-need capital.  *See, e.g.*, *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 481 n.170 (S.D.N.Y. 2010); *In re Emex Corp. Sec. Litig.*, No. 01 Civ. 4886, 2002 WL 31093612, at *6 (S.D.N.Y. Sept. 18, 2002); *cf. San Leandro*, 75 F.3d at 813-14 (allegation that the defendants' desire to maintain high credit rating so as to raise capital cheaply does not plead a sufficiently particularized motive).  To be indicative of scienter, the allegations must move the desire to raise capital beyond the realm of the generic by illustrating some concrete and personal benefits defendants sought to attain.  *See In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 530-33 (S.D.N.Y. 2009).  Plaintiffs' suggestion that Citigroup's CEO was motivated to "save the company and protect his job," (Pls.' Mem. at 32), does not accomplish this.  *See Novak*, 216 F.3d at 307.

Plaintiffs next contend that defendants were motivated "to retain and generate ongoing management fees" that Citigroup earned in its subprime business.  (Pls.' Mem. at 31.)  But as with the desire to raise capital, the bare desire to earn management fees is too general to support a strong inference of scienter.  *See JP Morgan Chase Co.*, 553 F.3d at 200; *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 305 (S.D.N.Y. 2009).  In *JP Morgan Chase Co.*, shareholders accused the defendants of perpetrating a fraud in order to earn allegedly excessive fees from one of the corporation's clients.  *See* 553 F.3d at 200.  The court of appeals concluded that a desire to "maximize the corporation's profits" by earning allegedly "'excessive' fees in a competitive marketplace" did not constitute a motive to defraud that corporation's shareholders.  *JP Morgan Chase Co.*, 553 F.3d at 200.  The court explained, "Earning profits for the

shareholders is the essence of the duty of loyalty, and therefore it would be an unusual case where accomplishment of this objective constitutes the requisite motive to defraud the shareholders." *Id.* That reasoning applies with equal force here and compels the conclusion that the bare desire to earn management fees is not a cognizable motive to commit fraud.

Plaintiffs' attempts to establish recklessness are also deficient. The Complaint alleges that defendants acted in the face of a "growing consensus" that subprime-related investments were "highly risky." (Compl. ¶ 130.) In support of this conclusion, plaintiffs cite a litany of published reports, dating from 2005 to 2007, concerning "the impact the collapsing [housing] bubble would have on mortgages and subprime mortgage backed securities." (*Id.*) These "reports about a downturn in the subprime mortgage industry do not, by themselves, permit the inference that [defendants] knew or should have known that any of the statements [or omissions] cited in the complaint were misleading," *In re Citigroup Inc. S'holder Derivative Litig.*, No. 07 Civ. 9841, 2009 WL 2610746, at *10 (S.D.N.Y. Aug. 25, 2009); "general facts about the financial world" are insufficiently particularized to establish that defendants acted with scienter. *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*, 753 F. Supp. 2d 166, 185 (S.D.N.Y. 2010); *see Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010); *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 586 (S.D.N.Y. 2007).

In their opposition memorandum, plaintiffs take a different approach and assert that "Citigroup had a duty to know its subprime exposure" and that its failure to satisfy this duty was reckless. (Pls.' Mem. at 30-31.) This conclusory assertion does not have an adequate factual basis to support a cogent inference of scienter. Plaintiffs have alleged no facts establishing the existence of this supposed duty nor have they "specifically identified any reports or statements

that would have come to light in a reasonable investigation and that would have demonstrated the falsity of the allegedly misleading statements." *Dynex Capital*, 531 F.3d at 196.  Plaintiffs cannot get around the need to plead particularized facts by relying, as they do—and this only in their opposition memorandum—on the fact that the alleged fraud was billions of dollars in magnitude and "reache[d] to the core of the firm's operations."  (Pls.' Mem. at 30.)  In light of the PLSRA's heightened pleading standards, imputing knowledge based simply on the fact that the fraud concerned a firm's core operations is highly doubtful.  *See, e.g.*, *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 490 (S.D.N.Y. 2010); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 294 & n.209 (S.D.N.Y. 2006).  In any event, to invoke the "core operations" theory, plaintiffs must actually plead facts supporting the conclusion that the operations at issue actually were at the core of a company's business.  *See In re eSpeed, Inc.*, 457 F. Supp. 2d at 294.  Plaintiffs have not done so and the Court will not assume on the basis of the Complaint and its referenced documents that the tens of billions in subprime-related assets at issue here were "core" to Citigroup, a company which, at relevant times, had a "$2.2 trillion balance sheet," (Compl. ¶ 113).

Given the paucity of particularized allegations in this Complaint, any failure of disclosure on defendants' part is more likely attributable to the financial turmoil occurring in 2007 than to fraud or recklessness.  *See, e.g.*, *In re Security Capital Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 595-96 (S.D.N.Y. 2010); *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d at 305; *Plumbers & Steamfitters,* 694 F. Supp. 2d at 301.  As a result, the Court finds that plaintiffs have not established an inference of scienter that is at least as likely as an opposing inference of nonfraudulent intent.  This conclusion requires dismissal of the Section 10(b) claims asserted

here.[5]

> C.  Claims Pursuant to Minnesota Law

The Complaint asserts four causes of action pursuant to Minnesota law on behalf of putative subclasses of FA CAP participants employed in Minnesota.  None state a claim to relief.

> 1.  *The Securities Litigation Uniform Standards Act precludes the deceptive trade practices claim*

The Complaint asserts that defendants violated the Minnesota Deceptive Trade Practices Act ("MDTPA"), Minn. Stat. § 325D.44.  (Compl. ¶¶ 174-77.)  The Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 78bb(f),[6] precludes this claim.

SLUSA "renders nonactionable" certain state law class actions.  *Romano v. Kazacos*, 609 F.3d 512, 519 n.2 (2d Cir. 2010); *see* 15 U.S.C. § 78bb(f)(1) (no covered action "may be maintained in any State of Federal court").  The statute requires dismissal of a state law action that is (1) a "covered class action" (2) based on state statutory or common law (3) involving a "covered security" (4) that alleges that defendants made a "misrepresentation or omission of a material fact" or "used or employed any manipulative device or contrivance" (5) "in connection with the purchase or sale" of that security.  15 U.S.C. § 78bb(f)(1); *see Romano*, 609 F.3d at 517-18.

Defendants have demonstrated that plaintiffs' MDTPA claim fulfills these criteria.  It is a "covered" class action because it seeks damages on behalf of more than 50 people, (Compl. ¶¶ 40, 177).  *See* 15 U.S.C. § 78bb(f)(5)(B)(i)(I).  The claim is brought pursuant to Minnesota state law.  (Compl. ¶ 175).  It involves a covered security because Citigroup's stock trades on a regulated national exchange, (*id.* ¶ 140A).  *See* 15 U.S.C. §§ 78bb(f)(5)(E), 77r(b)(1).  The claim

---

[5]     The Court's conclusion is necessarily limited to the facts as alleged in this Complaint alone.
[6]     SLUSA is codified in the Exchange Act, 15 U.S.C. § 78bb(f), and the Securities Act, 15 U.S.C. § 77p, amending both statutes "in substantially identical ways."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 82 n.6 (2006).  For simplicity's sake, the Court refers only to the Exchange Act codification.  *See id.*

is premised on the misrepresentations and omissions of material facts.  (Compl. ¶ 174).  And the misrepresentations and omissions were in connection with the purchase and sale of a security, since they allegedly "induced securities transactions" and the claim asserted "necessarily involve[s]" or "necessarily rest[s] on" those transactions.  *Romano*, 609 F.3d at 522 (internal quotation marks omitted).

Plaintiffs do not dispute that their MDTPA claim satisfies these statutory requirements. They instead argue that preclusion only results if the state claim is "coterminous with a federal securities fraud claim" and requires a showing of scienter.  (Pls.' Mem. at 38.)  SLUSA preclusion is not so limited.  The claim need not be coterminous with a federal securities law violation for SLUSA to apply.  *See Romano*, 609 F.3d at 522-24.  Nor must scienter be an element of the state claim.  *See, e.g.*, *Winne v. Equitable Life Assurance Soc'y of U.S.*, 315 F. Supp. 2d 404, 413 (S.D.N.Y. 2003) ("The argument that SLUSA preempts only state-law claims alleging scienter must fail because no language in the statute supports it.").  Indeed, the Second Circuit has found SLUSA to preclude a claim brought pursuant to the very Minnesota deceptive practices statute at issue.  *See Dabit v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25, 30 n.2, 48 n.17 & 49 (concluding, inter alia, that SLUSA precluded claims related to brokerage commissions brought pursuant to the MDTPA), *overruled on other grounds*, 547 U.S. 71 (2006); *see also Jaspers v. Prime Vest Fin. Servs., Inc.*, No. 10 Civ. 853, 2010 WL 3463389, at *5-7 (D. Minn. Aug. 30, 2010) (holding that SLUSA precluded an MDTPA claim).  Because SLUSA's requirements are met, the Minnesota deceptive trade practices claim must be dismissed.

2.   *The Complaint fails to state a claim pursuant to Minnesota wage laws*

Employees participating in FA CAP forfeit their securities and the wages used to purchase them if they leave their employment with Citigroup before the securities vest.  (Compl.

¶ 14.)  Plaintiffs allege that the forfeiture component of the program violates Minnesota wage laws.  (*Id.* ¶ 178-80.)  Specifically, they argue that the FA CAP forfeiture provision violates Minnesota Statutes Section 181.03, subd. 1, which provides that an employer may not "with intent to defraud . . . directly or indirectly demand or receive from any employee any rebate or refund from the wages owed the employee under contract of employment with the employer."  Plaintiffs contend that forfeitures made pursuant to FA CAP constitute "unlawful indirect refunds of wages."  (Pls.' Mem. at 41.)

By its terms, Section 181.03, subd. 1 requires that the employer act with an "intent to defraud."  There are no allegations in the Complaint that any defendant acted with "intent to defraud" when seeking plaintiffs' voluntary participation in FA CAP.  Plaintiffs therefore fail to state a claim pursuant to Section 181.03.

Plaintiffs further argue that FA CAP contains "unreasonable forfeiture provisions under Minnesota law."  (Pls.' Mem. at 41.)  They cite cases in which Minnesota courts analyze forfeiture provisions for reasonableness when they are linked to a covenant not to compete.  *See, e.g.*, *Harris v. Bolin*, 247 N.W.2d 600 (Minn. 1976); *Medtronic, Inc. v. Hedemark*, No. A08-0987, 2009 WL 511760 (Minn. Ct. App. Mar. 3, 2009).  This authority is doubly inapposite.  The reasonableness of a forfeiture-for-competitive-activities clause arises pursuant to the Minnesota common law, *see Harris*, 247 N.W.2d at 603, not the Minnesota wage statute that forms the legal basis of the claim asserted in the Complaint.  In any event, it is the presence of a covenant against competition in a forfeiture provision that triggers a review of its reasonableness, *see id.* at 602; *Hedemark*, 2009 WL 511760 at *3, and there is no noncompete clause in FA CAP.  This kitchen-sink assault does not save plaintiffs' wage claims from dismissal.

27

### 3.   *The Complaint does not state a claim for conversion*

Taking another tack, plaintiffs claim that enforcement of FA CAP's forfeiture provision works an unlawful conversion of their property.  (Compl. ¶¶ 181-84.)  Under Minnesota law, conversion entails an unjustified interference with a person's right to the use, possession, or ownership of property.  *See Christensen v. Milbank Ins. Co.*, 658 N.W. 2d 580, 585 (Minn. 2003).  Plaintiffs fail to state a claim for conversion because they have not adequately pled that they had a right to the restricted stock or its monetary equivalent prior to vesting or that defendants acted without justification.  To the contrary, FA CAP expressly permitted the forfeiture about which plaintiffs now complain.  Plaintiffs offer no viable reason to question the validity of FA CAP's forfeiture provision or Citigroup's enforcement of it, so no conversion claim lies.  *See In re Citigroup, Inc.*, 535 F.3d 45, 58-59, 62 (1st Cir. 2008) (concluding that Citigroup employees could not maintain a conversion action pursuant to Florida or Georgia law because FA CAP expressly authorized forfeiture); *Spaulding v. Abbott Labs.*, No. 10 C 199, 2010 WL 4822894, at *2-5 (N.D. Ill. Nov. 22, 2010) (dismissing claim for conversion pursuant to Illinois law where corporation was "contractually entitled to forfeit [employee's] shares").

### 4.   *The Complaint does not state a claim for breach of fiduciary duty*

Plaintiffs assert a breach of fiduciary duty claim pursuant to Minnesota law against all defendants.  (Compl. ¶¶ 169-73.)  According to the Complaint, "[b]y accepting and maintaining the property" of the subclass, namely the wages diverted into FA CAP and the securities those wages purchased, "defendants assumed a fiduciary duty to preserve that property and to keep the [subclass] members reasonably informed about all facts relevant to their participation in the FA CAP."  (*Id.* ¶ 170.)  Plaintiffs allege that defendants failed to preserve their property or keep

them reasonably informed, in breach of this duty.  (*Id.* ¶ 171.)  Defendants argue that plaintiffs

fail to allege the existence of a fiduciary duty, necessitating dismissal of the claim.

Plaintiffs have not pled facts indicating the existence of a fiduciary duty.  In Minnesota,

"[f]iduciary relationships arise when one person trusts and confides in another who has superior

knowledge and authority."  *Swenson v. Bender*, 764 N.W.2d 596, 601 (Minn. Ct. App. 2009).

Certain relationships per se give rise to fiduciary duties, including the trustee-beneficiary

relationship.  *Id.*  At one point, the Complaint asserts that Citigroup held the property of subclass

members "in trust."  (Compl. ¶ 14.)  But as defendants point out, the facts alleged do not permit

the inference that a trust existed.  "A trust is created only if the settlor demonstrates, by external

expression, the intent to create a trust," *Bond v. Comm'r of Revenue*, 691 N.W.2d 831,

837 (Minn. 2005), and the Complaint is devoid of any allegations indicative of an intent to create

a trust.  Plaintiffs do not dispute this point in their opposition papers and thereby concede it.  *See,

e.g.*, *Dorchester Investors v. Peak Trends Trust*, No. 99 Civ. 4696, 2003 WL 223466, at *2

(S.D.N.Y. Feb. 3, 2003).

Plaintiffs offer a different theory in their opposition memorandum, insisting that a

fiduciary relationship arose because "[a]s employees" of Citigroup, they stood in a "confidential

relationship" with their employer and with the individual director defendants composing the

P&C Committee.  (Pls.' Mem. at 39.)   They provide no Minnesota authority indicating that an

employee "trusts and confides" in his employer in such a way as to give rise to a fiduciary

relationship.  *Swenson*, 764 N.W. 2d at 601.  To the contrary, Minnesota law provides that a

fiduciary relationship generally "transcends the ordinary business relationship."  *Carlson v. Sala

Architects, Inc.*, 732 N.W.2d 324, 331 (Minn. Ct. App. 2007).  In the absence of any authority

supporting plaintiffs' position, the Court finds no basis to conclude that "[a]s employees,

29

plaintiffs stood in a position of confidence and trust with the individual defendants." (Pls.' Mem. at 39.)

Last, plaintiffs contend that because the existence of a fiduciary duty is a question of fact under Minnesota law, resolution of their claim at the pleading stage is improper. Plaintiffs' conclusion does not follow from their premise. That the existence of a fiduciary relationship turns on questions of fact does not absolve plaintiffs of their burden to set forth in the Complaint "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. In this instance, that requires plaintiffs to set forth facts sufficient to support a plausible inference that a fiduciary relationship existed. *See, e.g.*, *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 414 (S.D.N.Y. 2010) (dismissing breach of fiduciary duty claims because plaintiffs failed to allege facts supporting an inference that a fiduciary relationship existed); *Ruyan of Am., Inc. v. Soterra, Inc.*, No. 07 Civ. 4730, 2008 WL 927927, at *4 (D. Minn. Apr. 7, 2008) (same). Plaintiffs have not met that burden here. Accordingly, the breach of fiduciary duty claim is dismissed.

### D.  Declaratory Judgment Claim

In March 2009, in connection with a joint venture between Citigroup and Morgan Stanley, certain FA CAP participants executed an agreement that purported to release claims these employees had against defendants, unless they were the "subject of a pending individual or certified class action." (Compl. ¶ 144.) Plaintiffs seek a judgment declaring the release "void, voidable, or otherwise invalid and unenforceable" because "[a]mong other things, there is no consideration, or insufficient consideration, for the Release." (*Id.* ¶ 144A.)

The Court agrees with defendants that the Complaint contains "no factual allegations that would render the release unenforceable." (Defs.' Mem. at 41.) The foregoing paragraph

reproduces the entirety of the substance about the release contained in the Complaint.  That substance amounts to nothing more than a threadbare legal conclusion, devoid of factual development, that the release is unenforceable.  This dearth of factual allegations necessitates dismissal of the declaratory judgment count for failure to state a claim.  *See Iqbal*, 129 S. Ct. at 1949 ("naked assertion[s] devoid of further factual enhancement" are insufficient to plead a claim to relief (internal quotation marks omitted)).  Plaintiffs' completely conclusory assertion of duress in their opposition memorandum, (Pls.' Mem. at 43), is an impermissible attempt to amend the Complaint through an opposition brief, *see, e.g.*, *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 305 (S.D.N.Y. 2008), and also fails due its lack of a factual underpinning.  This last minute assertion in a legal memoranda cannot save plaintiffs' declaratory judgment claim from dismissal.  Insofar as defendants raise the release as an affirmative defense, (Defs.' Mem. at 42), the dismissal of this action on other grounds obviates the need to address that argument.

## III.    CONCLUSION

For the reasons set forth, defendants' motion to dismiss the Complaint is GRANTED.

Dated: New York, New York
June 7, 2011

SO ORDERED:

Sidney H. Stein, U.S.D.J.